**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN A. MUELLER, | ) | |
| | ) | CASE NO.    1:12CV2565 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE PATRICIA GAUGHAN |
| | ) | |
| | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff John Mueller ("Mueller") challenges the final decision of the Commissioner of

Social Security, Carolyn W. Colvin[1] ("Commissioner"), denying his claim for a period of

disability ("POD"), disability insurance benefits ("DIB"), and supplemental security income

("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423,

1381 *et seq.*  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule

72.2(b).

For the reasons set forth below, it is recommended that the final decision of the

Commissioner be AFFIRMED.

---

[1]      Defendant indicates that Carolyn W. Colvin became the Acting Commissioner of
Social Security on February 14, 2013 and that, pursuant to Fed. R. Civ. P. 25(d), Ms. Colvin
should be substituted for Michael J. Astrue as the defendant in this suit.  (Doc. No. 15 at 1.)
Plaintiff does not object.

## I.  Procedural History

On March 6, 2008, Mueller filed applications for POD, DIB and SSI, alleging a disability onset date of April 22, 2002 and claiming he was disabled due to blindness in his left eye and glaucoma.  (Tr. 201.)  His applications were denied both initially and upon reconsideration.

On January 5, 2011, an Administrative Law Judge ("ALJ") held a hearing during which Mueller, represented by counsel, testified.  (Tr. 70- 103.)  After receiving testimony from Mueller, the ALJ determined that medical expert testimony would be beneficial.  (Tr. 19, 101-102.)  Thereafter a supplemental hearing was held on April 20, 2011, at which Mueller, represented by counsel, an impartial medical expert ("ME"), and an impartial vocational expert ("VE") testified.  (Tr. 37- 69.)  On June 2, 2011, the ALJ found Mueller was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  (Tr. 30.)  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 1-3.)

## II.  Evidence

### Personal and Vocational Evidence

Age thirty-six (36) at the time of his administrative hearing, Mueller is a "younger" person under social security regulations.  *See* 20 C.F.R. § 404.1563 & 416.963(c).  He completed the eleventh grade and has past relevant work as a construction laborer.  (Tr. 74.)

### Medical Evidence[2]

On April 19, 2001, Mueller was injured at work when a nail gun misfired a nail into his

---

[2]     In addition to the physical limitations that are at issue in this case, the ALJ evaluated Mueller's mental impairments and included mental limitations in the residual functional capacity ("RFC").  As Mueller does not raise any argument regarding the RFC's mental limitations, this Report & Recommendation does not discuss the evidence regarding his mental impairments.

2

left eye.  (Tr. 585.)  The same day, a corneal laceration in Mueller's left eye was surgically

repaired.  (Tr. 424.)  The following week, Mueller underwent a phacoemulsification and small

incision intraocular lens implantation in the left eye.  (Tr. 586.)  Samuel Salamon, M.D.,

performed both procedures and continued to treat Mueller until at least December 2008.  (Tr.

424, 586, 550.)

Dr. Salamon's treatment notes indicate Mueller developed secondary glaucoma due to

trauma resulting from his injury.  (Tr. 395-400.)  In addition, in April 2003, Mueller presented to

Dr. Salamon with complaints of  migraines.  (Tr. 597.)  In September 2003, Mueller indicated he

had "persistent" headaches two to three times per week and an increase in migraines.  (Tr. 597.)

On April 3, 2008, Dr. Salamon completed a Bureau of Disability Determination ("BDD")

questionnaire regarding Mueller's visual impairments.  (Tr. 466-472.)  At that time, he recorded

Mueller's visual acuity with best correction as 20/70 in the left eye and 20/30 in the right eye.

(Tr. 467.)  Dr. Salamon noted corneal scarring in the left eye, optic nerve changes consistent

with glaucoma, and abnormal visual fields.  (Tr. 467, 469-470.)  He diagnosed glaucoma in both

eyes and opined that Mueller had reduced depth perception and peripheral vison.  (Tr. 470.)  In

light of these findings, Dr. Salamon determined Mueller should not drive heavy equipment or

climb high ladders but opined he had no limitations in lifting, reading, or driving.  (Tr. 470.)

Brian Kane, O.D., examined Mueller on April 4, 2008 and noted he had a history of

significant corneal scarring and cataract formation after the April 2001 injury.  (Tr. 555.)  He

also noted Mueller had glaucoma in the left eye and "the right eye has developed glaucoma due

to a presumed condition called sympathetic opthalmia of the right eye."  (Tr. 555.)  Dr. Kane

indicated Mueller's "intraocular lens in the left eye has sub-luxated out of position inducing

3

severe visual disturbances" and "[h]e is presently being evaluated for the appropriate time to have this surgically repaired."  (Tr. 555.)

In December 2008, Mueller presented to Dr. Salamon with complaints of "terrible headaches" and light sensitivity.  (Tr. 561.)  On December 11, 2008, Dr. Salamon completed a second BDD questionnaire regarding Mueller's visual impairments.  (Tr. 550-553.)  At that time, he recorded Mueller's visual acuity with best correction as 20/300 in the left eye and 20/40 in the right eye.  (Tr. 551.)  He noted Mueller had had variable vision in the left eye for several years and minimal limitation of vision in the right eye.  (Tr. 551, 553.)  He opined Mueller could not climb ladders or operate heavy machinery, but "should be able to function for driving, reading, etc."  (Tr. 553.)  He also noted Mueller had "normal depth perception."  (Tr. 553.)

Dr. Kane completed a Vision Impairment Medical Source Statement on December 20, 2010.  (Tr. 671- 673.)  He reported Mueller's visual acuity with best correction as 20/25+ in the left eye and 20/20 in the right eye.  (Tr. 671.)  He further indicated Mueller had less than 5% central vision in the left eye.  (Tr. 671.)  Dr. Kane opined Mueller could never perform work activities involving depth perception or field of vision, but could occasionally perform work activities involving accommodation and frequently perform activities involving near and far acuity and color vision.[3]  (Tr. 672.)  He also indicated Mueller is able to climb stairs and work

---

[3]     In *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, U.S. Department of Labor, 1993 (hereinafter "*Selected Characteristics*"), the term "near acuity" is defined as "clarity of vision at 20 inches or less."  *Selected Characteristics*, Appendix C, at C-4.  The term "far acuity" is defined as "clarity of vision at 20 feet or more."  *Id*.  The term "depth perception" is defined as "three-dimensional vision. Ability to judge distances and spatial relationships so as to see objects where and as they actually are."  *Id*.  The term "accommodation" is defined as "adjustment of lens of eye to bring an object into sharp focus.  This factor is required when doing near point work at varying distances from the eye." *Id.*  The term "color vision" is the "ability to identify and distinguish colors."  *Id*.  Finally,

4

with small and large objects, but is not capable of avoiding ordinary hazards in the workplace.
(Tr. 672.)  Finally, Dr. Kane opined Mueller would need to take unscheduled breaks every two hours of 10 -15 minutes in duration during an eight hour workday because "he needs to rest his eyes if the position has demanding visual tasks." (Tr. 673.)

***Hearing Testimony***

At the January 5, 2011 hearing, Mueller testified to the following:

- He does not have his own home.  He stays with his mother and sisters "from time to time," and with childhood friends "a couple of days here and there."  (Tr. 77-78.)

- He took special education classes beginning in third grade.  He did not graduate from high school and did not obtain a GED because he was "told by my counselors and teachers that I would never pass."  (Tr. 79.)  He has always had difficulty with reading comprehension.  (Tr. 79-80.)

- Prior to 2001, he worked as a landscaper and in construction work, including roofing, concrete, plumbing, dry wall, and painting.  (Tr. 81-82.)

- In 2001, he was injured at work when a nail gun misfired and a nail entered his left eye.  (Tr. 78.)  Since his injury, he has had numerous laser surgeries to cauterize the scar tissue but he still does not have clear vision.  (Tr. 86.)  He can read to a certain extent, but the letters look "blurry and blotchy."  (Tr. 80.)  He drives but "only if I have to."  (Tr. 81.)  Because of his injury, he has problems with depth perception and balance.  (Tr. 88, 94, 97.)  Sometimes he uses a cane to help him with his balance problems.  (Tr. 97-98.)

- He went back to work on "light duty" after his injury, but fell off a platform and broke his arm.  (Tr. 83.)  Since then, he has had a few part-time jobs but no full-time work.  (Tr.  83-84.)  He worries about getting injured again on the job.  (Tr. 87).

- He is very sensitive to light, especially sunlight.  (Tr. 89-91.)  He rarely goes out when it is bright outside.  (Tr. 90-91.)  His doctor prescribed special glasses to help keep the light out.  (Tr. 89.)  He also sometimes wears an eye patch, but it

---

the term "field of vision" is defined as "observing an area that can be seen up and down or to the right or left while eyes are fixed on a given point."  *Id.*

5

does not help much.  (Tr. 100-101.)  His light sensitivity has gotten
"progressively worse" since his 2001 injury.  (Tr. 89.)

•      He gets headaches "quite frequently," i.e. three to four times per week "if not
more."  (Tr. 88, 91.)  They last two to three days at a time.  (Tr. 88.)  The only
thing that helps is lying down in the dark, taking aspirin, and putting a cold rag on
his head.  (Tr.  88, 92.)  His doctor says the headaches are caused by his eye
injury.  (Tr. 89.)

•      He does not have health insurance or a regular doctor.  (Tr. 92-93.)  He has never
gone to a doctor specifically for his headaches because he has no insurance and
cannot pay for it.  (Tr. 93.)

At the conclusion of Mueller's testimony, the ALJ determined medical expert testimony

regarding his headaches would be beneficial.  (Tr. 101-102.)  A supplemental hearing was

conducted on April 20, 2011.  (Tr.  37-69.)

At the April 20, 2011, Mueller testified to the following:

•      The frequency of his headaches varies depending on his activities.  He tends to
experience more headaches when he spends time outside, reads, or bends over a
lot. (Tr. 41-42.)  Loud noises, such as his sister's "screaming children," also
trigger headaches.  (Tr. 42.)  Typically, he gets headaches seven to eight times per
month.  (Tr. 42 - 43.)  Some of them last for two to three days.  (Tr. 46-47.)  The
longest he has gone without a headache is seven to ten days.  (Tr. 50.)

•      When he has a headache, he often experiences dizziness and nausea.  (Tr. 43.)  He
stays in his room with the lights out, takes aspirin, and puts a warm or cold rag on
his head.  (Tr. 42, 50.)  He does not leave his house or watch TV when he is
having a headache.  (Tr. 50-51.)

•      Sometimes he will experience a sharp pain in his left eye that will bring on a
"small to extreme headache."  (Tr. 62.)

The ME testified he did not believe the record contained medical evidence of an

impairment that could reasonably be expected to produce Mueller's headaches.  (Tr. 53.)  While

he acknowledged Mueller has glaucoma in both his left and right eyes, the ME opined that

glaucoma does not cause head pain of the kind described by Mueller.  (Tr. 53.)  He indicated

6

Mueller's glaucoma appeared to be "responsive to treatment and it has nothing to do with his pain." (Tr. 58-59.) The ME also testified glaucoma would not cause light sensitivity. (Tr. 56.) While he noted that Mueller's testimony was consistent with migraines, the ME concluded his vision problems would not reasonably be expected to cause them. (Tr. 58-59.) Finally, he testified that, although Mueller is blind in his left eye, his right eye vision is normal despite the fact that he has glaucoma in that eye. (Tr. 59 - 60.)

> The ALJ then posed the following hypothetical to the VE:
>
> I want you to assume an individual 31 years of age with a high school education. I'd like you to further assume the hypothetical individual I'm describing would be able to perform a full range of exertional work, however, would be unable to climb ladders, ropes or scaffolds, would be limited to occasional balancing, occasional stooping, would not be able to work around hazards such as dangerous machinery or unprotected heights, would require an indoor job, a job that's primarily performed indoors with no more than occasional outdoor activity where they would not be exposed to bright lighting or loud noises. I want you to assume further that the individual has frequent near acuity, frequent far acuity, very limited depth perception, frequent color vision and limited field of vision. I'd like you to further assume that the hypothetical individual I'm describing would be able to understand, remember, and carry out simple instructions only in an environment where they would be performing routine and repetitive tasks in a non-public setting that required no more than occasional interaction with co-workers and supervisors.

(Tr. 64-65.) In response, the VE testified that such a hypothetical individual would be able to work as a laundry laborer, office cleaner, or inspector/hand packager. (Tr. 65.) In so finding, the VE noted his answer was consistent with the Dictionary of Occupational Titles ("DOT") and, further, with "the Selected Characteristics [of Occupations defined in the Revised DOT] in terms of physical demands because it does characterize near vision, far vision, and depth perception as part of the illustration." (Tr. 65-66.)

> The ALJ then added to the above hypothetical that "the individual would be absent from

7

work or have to leave their shift early an average of three or four times a month." (Tr. 66.) The VE testified that such a restriction would eliminate all jobs. (Tr. 66.)

Mueller's attorney then asked the VE to consider the ALJ's first hypothetical but included the additional restriction of no stooping. (Tr. 67.) The VE testified that would eliminate the laundry laborer, office cleaner, and inspector/hand packager jobs, but that "there are [other] jobs that don't require any stooping." (Tr. 67.) Mueller's attorney did not ask the VE to identify any such jobs but, instead, asked the VE to assume the ALJ's first hypothetical with the added restriction that, in addition to regular breaks, Mueller "would need to take unscheduled breaks during an eight hour work day which would be every two hours for 10 to 15 minutes." (Tr. 68.) The VE testified that such a restriction would eliminate all jobs. (Tr. 68.)

## II. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[4]

---

[4] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the

8

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Mueller was insured on his alleged disability onset date, April 22, 2002 and remained insured through September 30, 2009.  (Tr. 19.)  Therefore, in order to be entitled to POD and DIB, Mueller must establish a continuous twelve month period of disability commencing between those dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

### IV.  Summary of Commissioner's Decision

The ALJ found Mueller established medically determinable, severe impairments, due to glaucoma, diminished vision, depression, and borderline intellectual functioning; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (Tr. 22 - 23.)  Mueller was found incapable of performing his past work activities, but was determined to have a Residual Functional Capacity ("RFC") for the full range of work with certain nonexertional limitations.  (Tr. 23.)  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Mueller

claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

was not disabled.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by

10

substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

### VI.  Analysis

Mueller claims the ALJ erred by (1) failing to question the VE regarding Dr. Kane's opinion that Mueller would need unscheduled 10 to 15 minute breaks every two hours if engaged in "visually demanding tasks," and (2) finding Mueller to be less than fully credible regarding his complaints of migraine headaches.  (Doc. No. 14.)

#### *Failure to Question the VE regarding "Visually Demanding" Tasks*

11

Mueller first argues that, although the ALJ accorded full weight to the majority of treating physician Kane's opinions as set forth in his December 2010 assessment, the RFC failed to incorporate Dr. Kane's limitation of unscheduled breaks every two hours for 10 to 15 minutes. (Doc. No. 14 at 7.)  Mueller notes Dr. Kane indicated such breaks would be necessary for jobs requiring "demanding visual tasks."  (Tr. 673.)  While the hypothetical posed to the VE included visual restrictions relating to depth perception and field of vision, Mueller argues the ALJ committed reversible error because he failed to specifically question the VE regarding whether the jobs he identified (i.e. laundry laborer, cleaner, and inspector/hand packager) required "demanding visual tasks" or "less visually demanding work."  (Doc. No. 14 at 8.)

The Commissioner maintains that the ALJ did, in fact, account for Dr. Kane's unscheduled break restriction in the RFC by limiting Mueller to work requiring limited depth perception and limited field of vision.  She argues that, because this issue was properly accounted for in the RFC, the term "visually demanding work" did not need to be specifically mentioned in the hypothetical.  (Doc. No. 15 at 9.)

After recounting Mueller's hearing testimony and treatment history, the ALJ discussed Dr. Kane's opinions as follows:

> Brian Kane, O.D., completed a Vision Impairment Medical Source Statement on December 20, 2010. (Exhibit 20F).  Dr. Kane stated that he has treated the claimant for over four years for vision problems.  Dr. Kane stated that the claimant's visual acuity with best correction is 20/20 in the right eye and 20/25+ in the left eye, but that the claimant has less than five percent central vision in the left eye.  The claimant's symptoms include blurred vision, burning, itching, tearing, loss of vision, and pain.  Dr. Kane opined that the claimant cannot perform work activities involving depth perception or field of vision, but can occasionally perform work activities involving accommodation and frequently perform activities involving near and far acuity and color vision.  Dr. Kane indicated that the claimant is able to climb stairs and work with small and large objects, but cannot avoid

12

> ordinary workplace hazards.  **Dr. Kane stated that the claimant would need to rest his eyes in work with visually demanding tasks, such as taking a 10 to 15 minute break every two hours.**  I gave full weight to Dr. Kane's opinion as it is consistent with the evidence as a whole and with Dr. Salamon's opinions and treatment notes.  As the claimant's [sic] treating optometrist, he is in a better position to assess the claimant's functioning.

(Tr. 26) (emphasis added).  Later in the decision, the ALJ specifically addressed Dr. Kane's

opinion that Mueller would need unscheduled breaks, as follows:

> At the April 2011 hearing, Ms. Callen [Mueller's attorney] argued that the claimant's residual functional capacity should include the limitations that he can never stoop [and] would require 10 to 15 minute unscheduled break[s] every two hours, in addition to normal breaks, based upon Dr. Kane's December 2010 opinion. . . . Regarding the limitation regarding unscheduled breaks, Dr. Kane did state that the claimant would require unscheduled work breaks; however, he qualified this limitation by indicating that such breaks would be necessary "if the position has demanding visual tasks." (Exhibit 20F, p. 3).  Dr. Kane's opinion does not suggest that the claimant would require work breaks for less visually demanding work.  Therefore, the limitations Ms. Callen proposed are not included in the residual functional capacity. . .

(Tr. 29.)

> The ALJ formulated the RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant cannot climb ladders, ropes or scaffolds. He can occasionally balance and stoop.  He cannot work in proximity to workplace hazards, such as dangerous machinery and unprotected heights.  He is restricted to primarily indoor work with only occasional outdoor activity. He cannot work in an environment with exposure to bright lights or loud noises.  **Regarding his visual capabilities, he can perform work requiring frequent near acuity, far acuity, and color vision, but he is limited in depth perception and field of vision.** He is able to understand, remember, and carry out simple instructions in an environment where he is performing routine, repetitive tasks in a non-public setting that requires no more than occasional interaction with co-workers and supervisors.

(Tr. 23) (emphasis added).

13

The Court finds the ALJ did not err in failing to specifically question the VE regarding whether the jobs he identified (i.e. laundry laborer, cleaner, and inspector/hand packager) required "demanding visual tasks" or "less visually demanding work."  The first hypothetical posed to the VE at the supplemental hearing on April 20, 2011 expressly included visual limitations; i.e. that Mueller would be restricted to jobs requiring only limited depth perception and limited field of vision.  (Tr. 64-65.)  Indeed, in identifying the three jobs that met these restrictions, the VE noted that he had consulted the *Selected Characteristics* companion to the DOT precisely because it addressed these particular limitations. (Tr. 65 -66.)

The ALJ noted that Dr. Kane's unscheduled breaks restriction was only necessary for visually demanding tasks.  As set forth above, the ALJ then found that "Dr. Kane's opinion does not suggest that the claimant would require work breaks for less visually demanding work" and, "[t]herefore, the [unscheduled breaks restriction is] not included in the residual functional capacity."  (Tr. 29.)  In so finding, the ALJ clearly was of the opinion that the visual limitations in the RFC accounted for this issue and, further, that the jobs identified by the VE were not "visually demanding."

Mueller does not cite any regulation, case law, or other authoritative source suggesting that the ALJ was unreasonable in making this determination.  He does not attempt to define the term "visually demanding task" or explain in what respect the RFC's depth perception and field of vision limitations fail to account for such tasks.  Moreover, Mueller does not provide any meaningful explanation as to how he believes the three jobs identified by the VE (i.e. laundry laborer, cleaner, and inspector/hand packager) are "visually demanding."

A hypothetical question must precisely and comprehensively set forth every physical and

14

mental impairment that the ALJ accepts as true and significant.  *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  Where the hypothetical question is supported by evidence in the record, it need not reflect unsubstantiated allegations by the claimant.  *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990).  In fashioning a hypothetical question to be posed to a vocational expert, the ALJ is required to incorporate only those limitations that he accepts as credible.  *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (*citing Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993)).  However, where the ALJ relies upon a hypothetical question that fails to adequately account for all of the claimant's limitations, it follows that a finding of disability is not based on substantial evidence.  *See Newkirk v. Shalala*, 25 F.3d 316, 317 (6th Cir. 1994).

Here, Mueller has not demonstrated that the hypothetical posed to the VE during the April 20, 2011 hearing failed to adequately account for his visual limitations.  He has neither defined the term "visually demanding task" or made any meaningful argument that the RFC's depth perception and field of vision restrictions fail to adequately account for Dr. Kane's opinion regarding Mueller's need for "less visually demanding" work.  Accordingly, Mueller's first assignment of error is without merit.

### Credibility

Mueller argues the ALJ erred in finding him to be less than fully credible regarding his migraine headaches.  He maintains the ALJ failed to consider all the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) for evaluating subjective complaints.  Finally, Mueller asserts that, in finding him less than fully credible, the ALJ placed improper emphasis on his (1) unsuccessful work attempts; (2) failure to allege headaches on his initial disability application;

15

and, (3) ability to read and drive.  (Doc. No. 14 at 9-10.)

The Commissioner argues that the ALJ provided numerous reasons to discount Mueller's subjective allegations, including Mueller's wide range of daily activities, conservative course of treatment, and, gaps in the medical evidence documenting complaints of disabling headaches. (Doc. No. 15 at 12-14.)  The Commissioner also asserts the ALJ's opinion that Mueller's allegations were unsupported by the record was further buttressed by the opinion of the ME, who testified that Mueller did not have any impairments that would reasonably produce headaches. (Doc. No. 15 at 14.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment. Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms." SSR 96-7p.  Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *See Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record.  *Id.*

16

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96-7p, Purpose section; *see also Felisky,* 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").  To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* SSR 96–7p, Purpose.  Beyond medical evidence, there are seven factors that the ALJ should consider.[5]  The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence.  *See Cross,* 373 F.Supp.2d at 733; *Masch v. Barnhart*, 406 F.Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ accepted that Mueller suffered from various severe impairments, including

-------

[5]  The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96–7p, Introduction; *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 732-733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

glaucoma, diminished vision, depression, and, borderline intellectual functioning.  (Tr. 22.)  He found these impairments imposed "more than minimal limitations" in Mueller's ability to perform basic work activities.  (Tr. 22.)  However, the ALJ dismissed Mueller's statements concerning the intensity, persistence, and limiting effects of his headache symptoms as not credible to the extent they were inconsistent with the RFC.  (Tr. 24.)

In so finding, the ALJ discussed Mueller's written statements and hearing testimony, and gave particular consideration to the medical evidence regarding Mueller's complaints of headache pain.  (Tr. 24-26.)  In this regard, the ALJ noted that "the record contains little evidence of [headache] complaints or treatment."  (Tr. 26.)  He found the only medical evidence regarding this issue consisted of sporadic references to headaches in Dr. Salamon's treatment notes dated April 2003, September 2003, July 2008, and December 2008.  (Tr. 26.)  After recounting this evidence in some detail, the ALJ specifically observed that "[i]n opinions issued by Drs. Salamon and Kane, they did not report any limitations due to headaches." (Tr. 26.)

The ALJ then evaluated Mueller's credibility as follows:

The claimant's allegations are less than fully credible with respect to his subjective complaints. In particular, his allegations that his symptoms are so severe that he cannot perform work at substantial gainful activity levels are not credible in light of the objective medical evidence and his prior statements and reported actions.  For instance, the claimant has reported that his vision and mental impairments limit his ability to work and have prevented him from getting a job.  Nevertheless, the claimant continued to seek employment and did work, albeit for periods of less than six months, since the alleged onset date, which indicates that he believed he was capable of working.  In April 2008, he reported that he spent his days "trying to find work" (Exhibit 5E, p. 5).

While the claimant's visual impairment does impose limitations, examining physicians have indicated that the claimant is able to read and drive. (Exhibits 5F and 11F).  In written statements, the claimant indicated that he is able to drive, but does not do so because he does not have a car or

18

insurance, rather than because of his visual impairment.  (Exhibits 5E, p. 7 and 13E, p. 7).  In November 2006, the claimant reported having some difficulty with night driving, which indicates that he continued to drive (Exhibit 2F, p. 2). At the April 2011 hearing, the claimant testified that the is still driving only when he must.

**The claimant has alleged that frequent headaches would interfere with work activity.  The evidence does not support the frequency or severity of the claimant's reported headaches.  The claimant did not mention headaches among his impairments with his initial application (Exhibit 3E).  He has complained of headaches to treating physicians on occasion (see e.g. Exhibit 18F, p. 38); however, the evidence as a whole does not establish that the claimant has debilitating headaches.  In addition, the fact that the claimant continued to seek work well after the alleged onset date does not support his allegation of debilitating headaches.**

\* \* \*

Evidence of record regarding the claimant's daily activities is consistent with a residual functional capacity for work with the restrictions stated above.  The claimant is able to care for his personal needs, prepare simple meals, clean, launder, shop, manage his finances, and drive (Exhibits 5E and 13E).  However, to the extent that he is self-limited, this does not in itself establish a medical or pathological basis for such restrictions, nor is the claimant credible in alleging an incapacity for all sustained work activity.

There is no evidence that the claimant's use of prescribed medication is accompanied by side effects that would interfere significantly with his ability to perform work within the restrictions outlined in this decision.

\* \* \*

No treating source refers to the claimant as having incapacitating or debilitating symptoms that would prevent him from returning to the workplace, or has otherwise described the claimant as "totally and permanently disabled" by his impairments and complaints.

In summary, medical records do not corroborate the claimant's allegations of symptoms attributed to his impairments to an extent that would preclude the performance of work with the restrictions stated above.

(Tr. 28-29) (emphasis added).

The Court finds the ALJ did not improperly assess Mueller's credibility.  As set forth

19

*supra*, the ALJ fully considered the medical evidence, including evidence regarding Mueller's headaches.  The decision provides a number of specific reasons for finding Mueller to be less than fully credible, including his failure to mention headaches in his initial disability application; his frequent attempts to find part-time work after the April 2001 nail gun injury; and, the lack of medical opinion evidence indicating the presence of debilitating symptoms.  (Tr. 28-29.) Moreover, in reaching his credibility determination, the ALJ considered virtually all of the factors set forth in SSR 96-7p, including Mueller's testimony regarding his daily activities; the frequency and intensity of his headache pain; the factors that precipitate and aggravate his headache symptoms; and, measures used by Mueller to relieve his symptoms.  (Tr. 24-26.)

Mueller urges the Court to find that the reasons given by the ALJ do not demonstrate a lack of credibility.  However, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).  *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is *not* the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")  The ALJ provided sufficiently specific reasons for his credibility determination and supported those reasons with reference to specific evidence in the record.

## VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence.  Accordingly, the decision of the Commissioner should be AFFIRMED.

s/ Greg White
United States Magistrate Judge

Date: July 17, 2013

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).